## Claudio SEVERI, Plaintiff-Appellant,

v.

## SENECA COAL & IRON CORPORATION, Defendant-Appellee.

No. 82, Docket 30468.

United States Court of Appeals
Second Circuit.

Argued Oct. 20, 1966.

Decided July 3, 1967.

* Senior Circuit Judge of the D. C. Circuit, sitting by designation.

Pieter J. Kooiman, Frans J. J. van Heemstra, Abberley, Kooiman, Amon, Marcellino & Clay, New York City, for plaintiff-appellant.

George Becker, Harry T. Kirp, New York City, Susan K. Hochwald, for defendant-appellee.

Before WATERMAN, HAYS and ANDERSON, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant commenced this diversity action in the United States District Court for the Southern District of New York alleging that the appellee owed him an agreed-upon commission and other compensation for procuring a buyer for a quantity of Brazilian iron ore appellee

had offered for sale. After a non-jury trial the trial judge filed extensive Findings of Fact and Conclusions of Law and adjudged that plaintiff's complaint be dismissed on the merits.

Upon appeal from this judgment we hold that plaintiff is entitled to recover the commission he claims is due him, but agree with the result the trial court reached that he is not entitled to the additional sum he seeks.

Appellant, a citizen of Italy, is a coal and iron ore broker who sells these products to consumers in Europe. He conducts his business from his office in Rome, Italy. Appellee, Seneca Coal & Iron Corp. (Seneca) is a Delaware corporation with its principal place of business in New York City. It acts as a wholesaler, exporter, and selling agent of coal, coke, steel, and iron.

The transactions and negotiations between the parties were by letter and cable and were the subject of a stipulation that was incorporated into a detailed pre-trial order. Except for the short testimony of one defense witness the evidence adduced at the one-day trial was composed of correspondence and documents only. The issue was whether, as plaintiff contended, Seneca was plaintiff's sole principal, or whether, as defendant contended, it and plaintiff were acting for defendant's disclosed principal.

The pre-trial stipulation and the exhibits in evidence disclosed that starting in early 1960 appellant and appellee entered into a voluminous correspondence designed to consummate a sale of Brazilian iron ore by Seneca to a European buyer procured by Severi. This correspondence evidently envisioned a sale by Seneca on its own behalf; it contained no indication that Seneca was acting for any other party.

The transaction at issue can be considered to have been initiated by Severi's letter of May 28, 1960 [1] to Seneca. This

1. Introduced into evidence as part of Plaintiff's Exhibit 1 the letter reads as follows:

CS/mi

Messrs.
Seneca Coal & Iron Corp.
90, West Street
New York
(USA)

Important-Urgent
Gentlemen:
*Brazilian Iron Ore*
We have good prospects to close a business for 100,000 tons with a Blast Furnace and Steelwork, which was one of the best customers of the late Mr. Severi Sr., father of the writer, as Manager of VULCAAN ITALIANA and to which the writer did act as Agent for more than 100,000 tons Iron Ore in the past.
It is necessary that you study the enclosure, which is made according to the old contracts we did close with these friends. Your offer should be made in accordance to it; but, in case you prefer to offer fob Rio, you should add the guaranteed loading rate per working day. Sampling and weighing has always been made in Trieste, for Iron Ores of any Origin, Spain, India, Africa, even Italy, etc.
The present business is not included in any arrangement with "VULCAAN" Rotterdam; we are free and deal directly. However, please write us that you abstain from dealing Iron Ores with anybody else than Severi for 1960 and for consumers bying in Italy, Germany, Austria, Poland, Czechoslowakia, Hungary and Yougoslavia. In case we succeed to close the 100,000 tons, you will grant us the same protection for 1961/62.

This business can be done on commission basis or a sale between SENECA and SEVERI. Since the whole matter is made by transferable L/C no doubt we can pay you any important amount simply by transferring it. In case you prefer to have the contract directly with the Works, we suggest that you quote us your firm price; the margin which we shall add will be for SEVERI as commission. Upon request you shall cable or write to the Works quoting the price made by SEVERI, as your price.

Please do not write in one sheet the fob offer and the cif offer; will you be so kind to divide sharply the two cases by writing one offer only, or two separate offers if you like to offer alternatively, at buyers' option, in both ways.

We cannot say whether the consumer has already received, studied and rejected your ore. It's possible. In this case please stop any other channel because the

letter did not establish any legal relationship between the parties, but it is a necessary preface if one is to understand the communications which followed it. The next correspondence was Seneca's reply to Severi on June 2, 1960, which contained a firm offer for 15 days to sell 100,000 long tons of iron ore at $11.00 per ton.[2] In the light of the May 28th letter, this reply must be in-

chances and personal connections we have are really strong. In case you did already sell part of the ore, please offer us at least some cargoes.

Your offer should be firm (subject to nothing) for at least ⅔ weeks.

We await urgently your letter; you may perhaps cable us beforehand your price cif Trieste.

Trusting in your action, we are

Yours very truly,

C. S.

2. Introduced into evidence as part of Plaintiff's Exhibit 1 the letter reads as follows:

SENECA COAL & IRON CORPORATION

90 West Street

New York

Mr. Claudio Severi
Giorgio Baglivi 12
Rome, Italy

Dear Sir:

We are in receipt of your letter of May 28, 1960 with respect to our offering of Brazilian Iron Ore.

We hereby offer you firm, 100,000 tons hematite ore to be shipped from Rio de Janeiro, Brazil subject to the following terms and conditions:

*Quantity*: 10,000 gross tons per month

*Origin*: Itibirite, Minas Gerais, Brazil

*Quality*:

| | | |
|---|---|---|
| Iron (Fe) | 66% | Min. |
| Silica | 1.46% | Max. |
| Phos. | .05% | " |
| Sulphur | .03% | " |
| Alumina | 3.00% | " |
| Humidity | 1.00% | " |

Other elements such as copper, nickel, manganese, magnesium, zinc, titanium absent or only trace

*Price*: $11.00 (U. S.) per gross ton, f. o. b. vessel Rio de Janeiro for 66% guaranteed; a premium of 12½¢ per percentage point above the guaranteed minimum of 66%

*Composition*: Not more than 15% fines under ¾"; not less than 85% lumps from ¾" to 8".

*Payment*: By letter of Credit in U. S. dollars payable 90% against invoice and order bill of lading indorsed in blank signed by the master of the vessel. Balance of 10% upon final inspection of weight, analysis and moisture.

*Weighing and Sampling*: At port of discharge, subject to mutual agreement as to inspection agency, method, etc.

*Loading Time*: Guarantee loading of 2,000 tons per day minimum.

We are interested in your statement regarding your ability to close this business in the various countries mentioned in your letter. However, we cannot at this time commit ourselves to granting you exclusivity for those countries at least until you have indicated to us an ability to sell our ore. In the event that you can prove your ability to sell the ore, we will be very pleased to consider an exclusive arrangement, not only for 1960 but also for 1961 and 1962, as requested by you.

We have attached confirmation of our cable to you which is self-explanatory based on today's indicated vessel rate of $6.30.

If it makes no difference to you, we would prefer to have a contract directly with the purchaser.

We have made several offerings to European steel works, but in view of the fact that your letter fails to disclose with whom you are dealing in the

terpreted as including a promise to pay Severi a commission if Severi could produce a buyer willing and able to purchase such a quantity of ore on the offered terms. Although it is not entirely clear from the correspondence, the parties stipulated as one of the bases for their pre-trial order that on June 14, 1960 the defendant raised the offering price to $11.30 per long ton and agreed that this offered price included a commission of $.30 per long ton for Severi. The offer on these terms was extended through July 11, 1960.

Severi entered into negotiations with Vereinigte Osterreichische Eisen-Und Stahlwerke (Voest), an Austrian steel mill, to buy the Brazilian iron ore and he learned from Voest that the Austrian import authorities would not allow the transaction to be completed unless payment was made to a Brazilian bank in favor of a Brazilian seller. Severi made these conditions known to Seneca in a letter of June 11, 1960, with the comment "No doubt you have enough connections in Brazil to arrange the matters in order to follow these official prescriptions." The pre-trial stipulation sets forth that Seneca on June 15, 1960 advised Severi that this proposed method of payment was satisfactory. By a June 20, 1960 cable Seneca designated Consorcio de Mineracao Ltda of Belo Horizonte (Mineracao) as the Brazilian seller. Seneca's letter of the same day, June 20, 1960, confirmed this designation though Seneca also there referred to itself as the "exclusive American selling agents for the Brazilian company." [3]

countries designated, we cannot tell whether your customers have received any offerings from us. However, regardless of what offerings we may have made, if you produce the orders from any such customers, we will accept the same from you.

This offer is firm to you for 15 days from this date, but we will expect you to keep us advised during that period of any progress made by you.

We also call your attention to the fact that we will require 45 to 60 days for the first delivery to your customer and monthly thereafter.

We trust that this gives you all of the information you will require in order to discuss the proposition with your prospective purchasers.

Awaiting your further advices, we remain,

Yours very truly,

(sgd.) H. W. JAMISON
H. W. JAMISON
Sales Manager-Ores

———◆———

3. Introduced into evidence as Defendant's Exhibit H the letter in pertinent part reads as follows:
Mr. Claudio Severi
Via Giorgio Baglivi, 12
Rome, Italy
Dear Sir:
We beg to acknowledge receipt of your letters of June 15, June 17 and June 18 respectively.
It is a coincidence that one of the officials of the Brazilian company arrived in this country this morning and is actually sitting at my desk as this letter is being dictated so that whatever is written is being done with his full knowledge and consent and, in fact, at his direction.

With respect to your request that payment be made directly to the exporting company in Brazil, we cabled you on June 15 that the method of payment proposed by you was satisfactory to the exporting company. Accordingly, all letters of credit are to be established in favor of Consorcio de Mineracao Ltda. of Belo Horizonte and are to be established at the First National City Bank of New York at its branch in Rio de Janeiro.
\* \* \* \* \*
It is agreeable to hold this business open for you firm until June 30 but cannot possibly give you any further extensions. The official export price fixed by the Brazilian government was increased

On July 11, 1960, as a result of Severi's efforts, Voest agreed to buy 50,000 long tons of iron ore from Mineracao at $11.30 per ton and a written contract to this effect was executed by these two companies. Seneca was not a party to the contract. A further commitment, however, cabled to Severi, was made by Seneca on July 21, 1960, promising that if the buyer's chartered vessels would pay the shipper $.42 per ton for loading and trimming the iron ore aboard ship at Rio de Janeiro, the 42 cents so paid would be divided, 10 cents to Severi, 11 cents to Seneca, and 21 cents to Mineracao.[4] Voest agreed to pay the loading and trimming charges, and Severi claims this 10 cents per ton is owed to him from Seneca in addition to the 30 cents per ton commission owed to him on the 50,000 tons of ore contracted for by Voest.

Due to an internal transportation problem within Brazil, Mineracao was unable to deliver the 50,000 long tons of iron ore and Voest eventually, on November 2, 1960, canceled its contract and obtained iron ore from another source. As a result, Severi never received any compensation for obtaining Voest as a buyer of the ore. Therefore he instituted this action, alleging in his complaint that Seneca had contracted with him for his services, that he, on his part, had fully performed his part of the contract, and that he should have judgment for his $15,000 commission and his $5,000 share of the agreed-upon additional loading and trimming charges.

The court below dismissed plaintiff's complaint by concluding that Seneca's promise of June 2 was an offer for a unilateral contract which was accepted when Severi produced Voest's order on July 11 for 50,000 tons. It then held that Seneca was not liable to Severi because Severi had learned between June 2 and July 11—the offer and acceptance dates—that Mineracao, not Seneca, was the seller of the ore, and Severi had learned that, irrespective of the posture of Seneca's June 2 offer, it had developed prior to July 11 that Seneca was acting as an agent for Mineracao and that Mineracao had been disclosed to Severi as Seneca's principal prior to Severi's acceptance of the agent's offer. We accept the trial court's factual findings as to the events at issue, but we differ from it as to the characterization it makes of

to 11.50 per ton and even with your commission added, the price quoted you is less than that sum.

Furthermore, it may be of great interest to you to know that since June 10, the railroad freight rate from Minas Gerais to Rio has been increased by nearly 50%. It is also expected that on January 1, 1960, the minimum wage scale in Brazil will be raised and no further contracts are being made by the exporters except with an escalator clause providing for an increase in the actual labor cost in the quoted price in the proportion of the increase. The same will apply to any further increases in the railroad freight rate. We would therefore urge upon you most strongly that you try to complete this business at as early a date as possible or you might very well find yourselves in the position that we will be compelled to withdraw the offer now firm to you.

\* \* \* \* \*

We must request that all orders be given in our name as we are the exclusive American selling agents for the Brazilian company.

We trust that we have now covered all of the points raised in your various letters.

Yours very truly,
H. W. JAMISON
Sales Manager-Ores

HWJ:R
(Portions of the letter omitted relate to currency exchange problems and iron ore analysis problems, and are not relevant to the issues here.)

4. Introduced in evidence as part of Plaintiff's Exhibit 5 the cable reads as follows:
"Via ALL AMERICA"
CISEVERI
ROME (ITALY)
WITH UNDERSTANDING SHIP PAYS LOADING AND TRIMMING CHARGES OF 3/SENECA WILL PAY YOU TEN CENTS TON OF THIS CHARGE SENECA RETAINING ELEVEN STOP PRODUCER INSISTS OTHER 21 CENTS FOR THEM STOP NEED 45 DAYS NOTICE FIRST CARGO ALSO ADVISE
COALSENECA
Note: 3/ = 3 British shillings = 42¢

the transaction and the legal conclusion it draws therefrom. We have mentioned that the transactions between the parties were entirely by letter and cable and, except for the testimony of one witness for Seneca, the evidence at trial consisted of this correspondence and of the parties' documents.[5]

■ The district court arrived at its conclusions by a reliance on the inferences it drew from this voluminous correspondence and the undisputed facts agreed to by the parties in their pretrial stipulation, and as we are in precisely the same position we have no hesitancy in drawing different inferences and reaching a contrary result. See Agrashell, Inc. v. Bernard Sirotta Co., 344 F.2d 585, 589 (2 Cir. 1965); Miller v. Commissioner, 327 F.2d 846, 849 (2 Cir.), cert. denied, 379 U.S. 816, 85 S.Ct. 32, 13 L.Ed.2d 28 (1964); Mottaghi v. Barkey Importing, 244 F.2d 238, 248 (2 Cir.), cert. denied, Barkey Importing Co. v. Irauani Mottaghi, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957), 5 Moore, Federal Practice ¶52.04 (2d ed.1964).

From our study of all this material we find it to be clear that at the time of the initial offer Seneca was the only party with whom Severi was dealing and the subsequent insertion of Mineracao into Seneca's transaction with Severi did not create, to the prejudice of Severi, such a relationship between Mineracao and Seneca as would permit Seneca to escape liability to Severi by stating, at a convenient time for Seneca to state it, that Mineracao had been Seneca's undisclosed principal and was now being disclosed. It is clear that Seneca's insertion of Mineracao into the transaction was in response to the Austrian buyer's request in order to have the importation of the ore into Austria comply with Austrian trade regulations. A Seneca

letter to Severi of July 8, 1960 [6] dated but three days before Voest's agreement to buy from Mineracao sets this forth, and also sets forth its own position as it wished Severi to understand that position to be. The letter reads:

July 8, 1960

Mr. Claudio Severi
Giorgio Baglivi 12
Rome, Italy

Dear Sir:

Re: *Brazilian Iron Ore*

We have your letter of July 4 which we received late this afternoon after we received and answered your letter of July 5th. This delay was probably due to the Post Office. Contents of same have been noted and we reply as follows:

You already have the answers to your questions 1, 2, and 3 but we now will answer them in full detail so that there will be no misunderstanding.

\* \* \* \* \* \*

[Excluded portion of letter relates only to loading conditions and arrangements at Rio]

As far as the last paragraph of your letter is concerned, this has been answered in our letter to you of July 5 with the exception that Seneca is the sales agent for this ore and we are the ones who decide where we want the ore sold. This is not up to Mineracao. The reason the contract with Voest is directly with Mineracao is due to their request and the Austrian-Brazilian trade agreement. If any future ore is sold that does not pertain to any Brazilian trade agreement, the contract will be made directly with Seneca.

As to the sale of the 100,000 tons, we are still holding this open for you and we await some definite decision.

---

5. This witness, one of the founders of Mineracao, testified that in 1960 Seneca had no financial interest in Mineracao and Mineracao had no financial interest in Seneca. This testimony was undisputed and was admitted as relevant on the issue of whether Seneca was the actual seller or was a selling agent.

6. In evidence as Defendant's Exhibit N.

It is entirely up to you whether you will continue to offer this ore to Voest or to some other customer. All these matters can be straightened out after the Voest contract has been signed so then we will know where we stand.

Although, I might add, it is not good to have "all your eggs in one basket", but we leave this entirely up to you.

We hope that everything is clear in your mind now.

Yours very truly,

H. W. JAMISON

Sales Manager—Ores

HWJ:S

■ Even though Seneca refers to itself as "the sales agent for this ore," this letter readily lends itself to the interpretation that Seneca was at all times the principal in the sale of the Brazilian ore and that Seneca used Mineracao as an instrumentality to satisfy Austrian governmental import regulations. And we find it to be a fact that indeed Seneca was the real principal in the transaction. Seneca acted upon the Severi overture to it of May 28 with a prompt offer on its own account. As a condition of the acceptance of this offer the acceptor required that the offeror designate by name a Brazilian seller and a Brazilian bank through which payments would be made. This was complied with by Seneca, the offeror. Insofar as Severi and Voest were concerned the posture the parties were in when Voest entered into its written contract was that of executing a contract with a designee whose name had been furnished by Seneca, not that of executing a contract with a principal for whom Seneca, as a selling agent, had obtained a contract.

The defendant successfully objected to the introduction into evidence of any correspondence between the parties dated later than July 11, 1960. The objection was made on the ground that the parties' rights and liabilities relative to Severi's claims for a commission had been fixed when Voest agreed to buy the 50,000 tons of iron ore. Though plaintiff sought to have the excluded correspondence admitted, plaintiff did not press for its admission as probative of the fact that Seneca was Severi's sole principal, or press, on that ground, for the admission of pertinent correspondence between defendant and other persons, copies of which had been furnished plaintiff.

■ Plaintiff might well have so pressed. After the execution of the Voest contract with defendant's designee, defendant's activities in attempting to have the contract completed and the representations it made in connection therewith would appear to us to be relevant to whether Seneca was the real party in interest and whether the named contractor was but a contractor in name only. In particular, we would have supposed a letter written by the defendant on November 18, 1960, two weeks after Voest finally notified *Seneca*, not Seneca's designee, that it was forced to cancel the contract, would have been especially probative.[7] This letter was written to

---

7. Of course, upon review of a trial court's ruling relative to the admission or exclusion of offered evidence, the issue before the appellate court is ordinarily whether the ruling was so prejudicially erroneous as to require that the cause be remanded for a new trial. Here, however, the parties had agreed that adjudication could be had on the admissions made in their pretrial stipulation and on such of the voluminous correspondence as was not objectionable as irrelevant. Having this posture of the case in mind, we have looked at the excluded correspondence to ascertain its relevance. The pre-trial order listed 80 documentary items that the parties planned to offer, among them being Voest's cancellation cable to Seneca of November 2; a multi-page letter from Seneca to Severi of November 15, explaining in detail how Seneca had finally succeeded through a Dutch-owned Brazilian concern, represented in Rio by a Mr. Kurt Falk, in loading the first ore cargo onto a Voest-chartered vessel on November 8; and the copy of Seneca's letter to Falk of November 18 which Seneca had given to Severi.

Plaintiff offered the communications it wished to be introduced into evidence in batches; the first one here mentioned was in Plaintiff's 6 for identification which

one who Seneca had hoped would be able to fulfill the 50,000 ton ore needs of Voest whose chartered vessels were expected to arrive for loading. Looked at out of context this letter could be unhelpful, but in connection with other letters contemporaneous with it and batched with it in plaintiff's offered Exhibits 6 and 7 it is clear that defendant's admission of liability to Severi relates to the Voest transaction. The letter in pertinent part is reproduced in the margin.[8]

■ We consider the contents of this November 18, 1960 letter to be highly relevant to whether Seneca was obligated to pay Severi his commission, and to whether Seneca considered itself to be so obligated. The letter clearly indicates that Seneca considered that it, rather than a disclosed principal for whom it had been acting as a selling agent and who was no longer bound to deliver any ore, owed Severi his 30¢ commission.

■ In view of the understanding of the parties as to the agreed method of trial, and inasmuch as we are dealing here with documentary evidence, we are ruling that this letter of November 18 is properly before us, and is properly admissible in evidence as a statement by a party against its interest. Accordingly, being satisfied from all the evidence that Seneca was Severi's sole principal, we are reversing the district court's determination to the extent that we are holding Seneca liable for the agreed-upon commission of 30¢ per ton on 50,000 tons.

■ While Severi is thus entitled to his 30 cents per ton commission for securing a buyer for Seneca's iron ore, he is not entitled to the additional 10 cents per ton he seeks to obtain from Seneca pursuant to Seneca's July 21 cable reproduced in footnote 4 supra. The cable was quite definite. It stated that if Voest's chartered vessel at Rio paid dockside loading and trimming charges of three shillings a ton to a Seneca-obtained shipper, Seneca would pay Severi 10 cents out of each three shillings so paid. The evidence is clear that neither Voest, nor its chartered vessels, made any such payment to Seneca or to a Seneca-obtained shipper. As no such payment was made, and as Seneca had no control over whether it ought to have been paid, the result reached below in this particular is affirmed.

Judgment below reversed in part, and cause remanded for the entry of a judgment for plaintiff consistent with this opinion.

---

contained 24 items, the latter two in Plaintiff's 7 for identification which contained 14 items. Both batches were excluded *in toto.*

8.  SENECA COAL & IRON CORPORATION
90 West Street
New York
November 18, 1960

Mr. Kurt Falk
Wm. H. Muller SA
Avenida Rio Bronca 57
Rio de Janeiro, Brazil
Dear Kurt:

It is now more than a week since our last meeting in Rio and I am very greatly disappointed and perturbed that I have received no word with respect to our claim for compensation on the Voest order, on the additional 20,000 tons for Yougoslavia and for the allocation I requested for 1961.

Yesterday, I had quite a long telephone conversation with Mr. Ricards of the New York office and at its conclusion, I was even more at sea than I was before I spoke to him. He had received no advice from Holland and even questioned our right to any compensation on the ground that the loading of the BARBARO and future loadings were not made nor would be made on our contract, but on a contract that Muller had apparently made directly with Voest.

I would like to recall the events of my first meeting with you at my hotel in Rio, Oct. 29. At that time, I showed you the contract, letter of credit and the charter party. I told you that we would like Muller to fill the contract for us because we had been misled by the promises Oreclone had made to fulfill the contract; I also told you that we were obligated to pay to Severi, our agent in Europe, a commission of 30¢ per ton on that order and that we were to receive the loading payment of three shillings (.42) per ton.