**GEMINI NAVIGATION, INC.,**
Plaintiff-Appellee,

v.

**PHILIPP BROTHERS DIVISION OF MINERALS & CHEMICALS PHILIPP CORPORATION and Royal Insurance Company, Limited, Defendants-Appellants.**

No. 962, Docket 73-2775.

United States Court of Appeals, Second Circuit.

Argued May 2, 1974.

Decided July 1, 1974.

Donald B. Allen, Cichanowicz & Callan, New York City, for plaintiff-appellee.

Joseph J. Magrath, 3rd, Thomas J. Hanrahan, Bigham, Englar, Jones & Houston, New York City, for defendants-appellants.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

WATERMAN, Circuit Judge:

Defendants-appellants Philipp Brothers and Royal Insurance Company Limited appeal from a judgment of the United States District Court for the Southern District of New York entered after a trial by the court without a jury, holding defendants liable to plaintiff-appellee Gemini Navigation Inc. for contri-

bution in general average. Invoking the "clearly erroneous" standard of Rule 52 of the Federal Rules of Civil Procedure, appellants implore us to hold that the findings of fact upon which the judgment below was predicated are unsupported by the evidence which was before the district court. As a rule, we are unwilling to disturb the factual determinations reached by an able and experienced trial judge. However, after a careful review of the findings here, we conclude, without hesitation, that the district court's findings are clearly erroneous. Accordingly, we reverse the decision below and order that judgment be entered in favor of defendants-appellants.

Plaintiff-appellee Gemini Navigation Inc. ("Gemini") was the owner of the vessel *S.S. Ionic Bay* ("Ionic"). Philipp Brothers ("Philipp") is the owner of a particular cargo which was conveyed by the *Ionic* from Costanza, Roumania to Charleston, South Carolina. Royal Insurance Company Limited ("Royal") is the cargo owner's insurer and was a defendant in the district court by virtue of its guarantee to pay any contribution due from the cargo owner.

This case concerns the effort of a vessel owner to obtain from a cargo owner contribution in general average for which the cargo owner is alleged to be legally liable.[1] What emerges from a close inspection of the events which comprise the final odyssey of the *Ionic*, however, is an audacious attempt to foist onto the cargo owner expenses which legitimately should be borne by the vessel owner alone.

Our tale begins in the Far East on June 28, 1966, well before the *Ionic* had loaded the cargo owned by Philipp. On that date the *Ionic* departed from Singapore and set out for its destination of Ancona, Italy. This departure was accomplished barely two days before the June 30th expiration date of the *Ionic's* International Load Line Certificate.[2] This impending expiration was postponed, however, by an extension of the expiration date. An extension is automatically granted to a vessel whose Certificate would otherwise expire if that vessel is at sea, but the Certificate does expire upon the vessel's arrival at the first port reached after the original time for expiration has passed. In this case the *Ionic's* first port of call after June 30 was Aden, at which port the *Ionic* applied for and was granted a formal extension of the International Load Line Certificate until August 31, 1966. After proceeding to Ancona, Italy and unloading her cargo there in early August 1966, the *Ionic* requested a further extension of the Certificate from the American Bureau of Shipping ("ABS"). Acting upon this application, the Bureau sent one of its expert surveyors to inspect the ship while it was still at Ancona. The surveyor, Mr. Passalacqua, discovering that extensive repairs were necessary before a further extension of the Certificate could be authorized, denied the request. The master of the *Ionic* then advised Mr. Passalacqua that it was his intention to sail to Piraeus where the necessary repair work could be performed. Yet, despite what the surveyor had been told, the *Ionic* did not sail for Piraeus but rather, at the instructions of its owners, sailed directly to Costanza, Roumania. The vessel reached Costanza on August 16 and immediately began to load the cargo owned by Philipp.

---

1. The concept of "general average" is an ancient one based on the principle "that loss for the common benefit which is incurred by one who partakes in a maritime venture should be shared ratably by all who participate in the venture." Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884, 891 (D.Md.1967). "The question of whether or not all or any part of the loss suffered by ship or cargo or both [or extraordinary expense incurred to avert such a loss] is a general average loss [or expense] depends upon how much, if any, of the damage [or extraordinary expense] was sustained in connection with efforts for the common good of both ship and cargo." Id.

2. At all times during its last voyage, the *Ionic* was subject to the provisions of the International Load Line Convention (1930), an agreement which has since been superseded.

From August 16 until August 27, the stevedore, working twenty four hours a day, continued to load the cargo, which consisted of ponderous steel ingots of irregular shape. Closely supervising the loading, the master of the *Ionic*, Captain Varias, was sufficiently disturbed by the carelessness of the stevedore's workers in stowing the ingots that he twice, on August 24 and again on August 26,[3] wrote to the stevedore complaining that the improper stowage was compromising the ability of the vessel to proceed safely at sea. Also, the master noted in the ship's log for the 26th and 27th of August:

> Friday 26th "Loading in No. 5 hold continues. Letter sent to Stevedores stating that the safety of the vessel was in danger owing to bad stowage of cargo.

24:00 Loading continues.
Sat. 27th
10:15 All loading completed. . . .

\* \* \* \* \* \*

As can be seen, the loading was completed within one day after the master sent the second of his two protests to the stevedore. Furthermore, there was no log entry which would indicate that subsequent to the master's letters of complaint the dangerous condition of the stowage was rectified by the stevedore. Despite the passage of so little time between the second complaint and the cessation of loading, and despite the absence of a log entry noting that the stevedore had employed satisfactory corrective measures, Captain Varias now claims in his deposition in this litigation that the stevedore had satisfactorily remedied all defects in the stowage of

---

3. The letters of August 24th and August 26th read:

s/s "Ionic Bay"

Messrs
Romtrans and Stevedoring
Department
Constanza,

Constanza, August 24th 1966

Dear Sirs

This is to draw your attention to the following matter, your workers loading ingots, moulds, on the above state vessel, they are careless concerning to the stowage of cargo leaving unsual spaces untrimed, therefore the safety of vessel coming in a dangerous position owing to the nature of cargo.

Please advise your workers to be more carefull with the above matter to avoid troubles and delays.

Yours faithfully
G. Varias, Master

---

s/s "Ionic Bay"

Messrs
Romtrans and
Stevedoring department
Constanza,

Constanza, August 26th 1966

Dear Sirs

Due to the fact that yours workers continue to stowage the cargo very uncarefully, I would like to draw your attention to the matter that after the completion of loading ~~of loading~~ the safety of vessel should be came in very dangerous point in case. to refuse the sailing of vessel.

In connection with the above situation you will kept liable and full responssible for any damage, delay or expenses, during loading, after the completion of loading or during the voyage and for any claim will be raised against concerned parties.

Yours faithfully
G. Varias, Master

the steel ingots by the time the ship sailed.

The *Ionic* left Costanza at 4:50 P.M. on the 27th of August, roughly four days before its International Load Line Certificate (for which it had already been denied an extension at Ancona due to the ship's deteriorating condition) was due to expire once again. There was only one way in which the *Ionic* could complete her voyage to Charleston without having to incur the significant costs of the repairs which the surveyor at Ancona had informed Captain Varias would be necessary before an extension of the Certificate could be granted; if the *Ionic* could clear Augusta, Sicily, its next intended port of call, by midnight of August 31, 1966, the vessel's Certificate would be automatically extended until she reached Charleston, her ultimate destination. Should the ship be unable to leave Augusta by that time, the cleverly conceived plans of the vessel's owners would be frustrated, for the Italian authorities would, under the terms of the International Load Line Convention, be required to prevent her departure.[4]

The vessel owner's scheme aborted, for the race against the clock, which commenced with the frenetic loading of the ingots at Costanza, was lost somewhere in the Aegean Sea, either because it became apparent that the condition of the cargo had become precarious, if it had not been precarious before, or, perhaps, as Philipp in its brief here appears to intimate, simply because the time the voyage would take had been miscalculated. In any event, it was now obvious, if it had not been obvious before, that the cargo should be restowed before the vessel could safely attempt a crossing of the Atlantic Ocean. The *Ionic* arrived at Augusta, which, as we have said, was its next port of call, at 7:25 P.M. on August 31, 1966, only hours before the expiration of her Certificate.

The principal point of dispute in this case is the cause of the precarious state of the cargo discovered at Augusta. Gemini attributes this condition of the cargo to a shift caused by what it claims were rough seas and high winds encountered on the voyage from Costanza to Augusta. Philipp, on the other hand, claims that the condition of the cargo at Augusta and the resultant need for restowage emanated from improper stowage of the cargo at Costanza, for which Gemini alone would be responsible.[5] Before we address this issue, we must return to our narrative.

Upon her arrival at Augusta, the *Ionic* was subjected to an inspection by three ABS surveyors who authorized her to make one direct voyage to another

4. If these officials failed to prevent the *Ionic's* departure after the expiration of her Certificate her hull insurance would be void.

5. The parties here and the court below have devoted considerable attention to the velocity of the winds and the turbulence of the sea which the *Ionic* encountered on its voyage from Costanza to Augusta. We are convinced, and Gemini does not now appear to dispute, that the weather and sea conditions, while not benign, did not approach those which would constitute a "peril of the sea." Gemini's present contention is that, despite careful stowage at Costanza, rough seas caused a shift of the cargo and the creation of the disarray discovered at Augusta. The evidence before us does indicate that there was some "shifting" of the cargo during the crossing of the Aegean Sea, although that evidence is inconclusive as to the extent of the shifting. As will be seen, it seems that the stowage conditions observed at Augusta and Naples could well have been the stowage condition when the ship left Costanza rather than have been the product of any shifting of the cargo en route. Indeed, some of the objectionable stowage, with heavy ingots piled on top of each other in the center of the hold instead of being dispersed toward the sides of the vessel, could under no stretch of the imagination have been a product of "shifting." Even if we accept as a fact that the stormy seas did cause some significant shifting, the validity of Gemini's present position, one not predicated on a "peril of the sea" theory, must still turn on the care with which the cargo was stowed at Costana. There is copious evidence on this point. Therefore, it is unnecessary for us to delve into the factual issue of the extent of the shifting, and we instead focus our inquiry on the manner in which the cargo had been stowed at Costanza.

Mediterranean port for the purpose of making the repairs necessary for an extension of her Certificate. On Sept. 2 and Sept. 3 a surveyor employed by Gemini itself boarded the ship and inspected the cargo. The conclusion of this surveyor, one Santangelo, contained in a report dated September 7, 1966, was that. "there *had been* an irregular stowage distribution." (Emphasis inserted). That this conclusion refers to the stowage *at Costanza* is confirmed by a letter sent *by Gemini* immediately after it had received the results of Santangelo's cargo survey. This letter advised the vessel's time charterers that the *Ionic* would have to proceed from Augusta to another port for repairs and restowage necessitated by "the failure to stow the cargo properly *at Costanza.*" (Emphasis inserted). Additional proof that the report referred to the manner of stowage at Costanza is supplied by Santangelo's concession in his 1971 deposition in this case that his inspection had revealed that the initial stowage achieved at Costanza had not been "very good."

It was decided that the *Ionic* would be repaired and the cargo restowed at Naples. Once there she was inspected by another three experienced cargo surveyors, two of whom were employed by Gemini. The report, to which we shall henceforth refer as Exhibit 12, filed by the two Gemini surveyors after an exhaustive investigation found categorically that the cargo had been stowed improperly at Costanza. For the moment we defer extended discussion of this report which the district court apparently believed concluded no more than that the cargo, as observed at Naples, was improperly distributed and would have to be restowed.

While the ship was in Naples, another team of ABS surveyors examined the vessel to ascertain what hull repairs were required for extension of the ship's Certificate. Their findings comported with the earlier findings which we have referred to *supra,* those reached by ABS surveyor Passalacqua in Ancona in early August 1966. The deficiencies discovered in these surveys, inasmuch as they existed prior to the time when Philipp's cargo was brought aboard ship, were therefore. defects for which the vessel owner alone was responsible.

After the necessary restowage and repair work had been performed at Naples, the *Ionic's* Certificate was extended to allow one voyage to Charleston, with an admonition that further repairs would have to be performed there before any subsequent voyages would be permitted. The voyage to Charleston was successfully completed, but before Philipp was allowed to remove its cargo it was compelled to sign a general average agreement. Interestingly, *Gemini's* adjuster described the cause of the casualty which purportedly gave rise to Philipp's liability for general average: "[T]he cargo shifted due to improper stowage." Not surprisingly, after the discharge of this cargo the *Ionic* was sold for scrap.

The legal theory that governs the disposition of this case is not complex and is not in dispute here. The contract between the parties, the bill of lading, incorporated the terms of a voyage charter. The significant clauses of that charter are:

"Clause 13—Any averages occurring under this charter to be settled in New York according to York-Antwerp Rules, 1950.

\*　　\*　　\*　　\*　　\*　　\*

Clause 40—"New Jason Clause . . . to be considered fully incorporated . . . ."

The New Jason Clause provides:

"In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses

750

of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods."

The function which this clause performs is to make the cargo owner liable for contribution in general average in any instance in which the vessel owner would have a valid legal defense to any claim brought against him by the cargo owner for damage to the cargo. Thus, if the vessel owner would not be legally responsible for the peril to which the cargo is, or might be, exposed, the vessel owner is entitled to contribution for any sacrifices made or expenses incurred to insure the safe carriage of the cargo. Inasmuch as a shipment in foreign commerce was involved in this case, the parties were subject to the United States Carriage of Goods by Sea Act ("COG-SA"), 46 U.S.C. § 1300 et seq., the pertinent portions of which are found in 46 U.S.C. § 1304(2)(c), (q):

> (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from

> \* \* \* \* \* \*

> (c) Perils, dangers, and accidents of the sea or other navigable waters;

> \* \* \* \* \* \*

> (q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier,
> . . .

In this case the danger to which the cargo was exposed was the precarious condition of the stowage discovered at Augusta, which condition made restowage essential. The issue here then is whether the vessel owner is legally responsible for allowing this state of peril to develop or, more specifically, was the perilous condition found to exist in Augusta due to an initial improper stowage at Costanza? If the stowage at Costanza, which all parties acknowledge was the responsibility of the vessel owner, was proper, then the vessel owner would not

be responsible for any shifting of the cargo caused by rough seas between Costanza and Augusta and would consequently be entitled to contribution from the cargo owner for the costs incurred in eliminating the danger that developed without the vessel owner's fault.

The issue of whether the cargo was properly stowed at Costanza is an issue of fact. Resolving this issue, the district court found that "[t]he cargo was completely secured and properly stowed for the voyage to Charleston, South Carolina." This conclusion was reached, however, after a trial in which there were only two live witnesses, both of whom were outside experts. The remainder of the evidence, and by far the most important portion of it, consisted of documents and deposition testimony. On the evidence before us we are of "the definite and firm conviction that a mistake has been committed," Iravani Mottaghi v. Barkey Importing Co., 244 F.2d 238, 248 (2 Cir.), cert. denied, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957), quoting United States v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 92 L.Ed. 746 (1948). The bulk of that evidence is contained in written material, and "this court, on review, is in as good a position as the trial court to examine, interpret and draw inferences from [the documents and depositions offered into evidence]." J. Gerber & Co. v. S.S. Sabine Howaldt, 437 F.2d 580, 586 (2 Cir. 1971); accord, Severi v. Seneca Coal & Iron Corp., 381 F.2d 482, 488 (2 Cir. 1967).

As noted, the district court was of the opinion that the cargo had been properly stowed at Costanza and that the dangerous condition discovered at Augusta was a direct result of a shifting of the cargo caused by severe turbulence that the court found the Ionic experienced on the voyage from Costanza to Augusta. In finding that the cargo had been carefully and properly stowed at Costanza, the trial court relied on two pieces of evidence—the deposition testimony of Varias, the master of the Ionic during the loading at Costanza and during the voy-

age to Augusta, and the live testimony of an expert witness, Captain Merle Allen. The court either totally disregarded all the other evidence or dismissed what was termed "[t]he testimony of the surveyors adverted to by the defendant[s]" as but references "to the condition of stowage at the time the cargo was examined at Augusta or Naples, not at the time of departure from Costanza." In addition, the district court declared that "[t]he expiration of the Loadline Certificate has no bearing on the resolution of the issues presented by this claim."

 The finding that the cargo was properly stowed at Costanza, an issue on which the carrier has the burden of proof, see G. Gilmore & C. Black, Jr., The Law of Admiralty § 3–43, at 162–63 (1957), is clearly erroneous. The only fragments of evidence which the district court could summon to support this finding were the deposition testimony of the ship's master, Captain Varias, and the live testimony of an expert witness who had no firsthand knowledge of any of the events involved. To be sure, the master did testify by deposition in 1970 that by the time the *Ionic* had left Costanza on August 27, 1966, he was personally satisfied that the stowage "realized" there was a proper and safe one. This 1970 declaration would appear to be a self-serving assertion of late invention, for he had transmitted written protests, referred to *supra*, to the stevedore on August 24 and August 26, and the only inference that can be drawn from the fact that these protests were made is that the carelessness in loading began on or before the 24th of August and continued into the 26th. Thus the workers had been loading the bulk cargo haphazardly for at least three days. Yet the master, some years later, asserts that the improper stowage flowing from this protracted negligence on the part of the stevedore's workers was remedied before all loading was completed at 10:15 on the morning of August 27. The master's claim seems preposterous. It is a virtual certainty, given the unwieldy nature of the cargo and the length of time the careless loading had continued, that the condition could not have been effectively corrected in one day. Exhibit 12, to which we have already alluded and to which we shall return shortly, makes this precise point. Furthermore, this minimum span of at least three days of careless loading comports perfectly with the conclusion on that point reached by Exhibit 12's authors, both of whom were not employed by the cargo owner but by the vessel owner. These surveyors found that of the 13,000 tons of the steel ingot cargo, about 3,000 tons had been badly stowed at Costanza. Moreover, in view of the *presence* of a log entry noting the carelessness in stowing the cargo, the master's deposition testimony is further weakened by the *absence* of a subsequent log entry showing that the dangerous condition had been corrected. The testimony of the master should thus be accorded minimal, if any, weight.

The district court also relied on the live expert testimony of Captain Merle Allen. As noted, the captain had no firsthand familiarity with the *Ionic's* adventures of 1966. It is true that upon questioning by plaintiff's attorney he initially indicated basic approval of the general manner in which he had been apprised the cargo had been stowed at Costanza. He stated that while it is best to have as flat a distribution of the ponderous pieces as possible, so that dangerous shifting toward the skin of the ship does not occur, this was not always possible because the bulk and irregular shape of the huge ingots made loading inside the confines of a hull of a ship a difficult chore. As a result, the "regular stow for that type [of cargo] would appear to be a bit towards the center, to a degree, because of height of decks and the ability to move and stow outboard with anything weighing from two to ten tons . . . . It would not be flattened out to the point that it would be level floor across any given area." While this testimony, again based on what the expert was told and not on any factual observation on his

part of the stowage of the *Ionic's* cargo, gives some support to the vessel's claims, Captain Allen made three concessions on cross-examination which render his direct testimony of little worth. First of all, the captain admitted that he had never been shown Exhibit 12, in which, as we have mentioned, expert surveyors, who *did* have the benefit of firsthand observation of the stowage, concluded that the irregular cargo distribution, pitched at the center, was a totally inexcusable and dangerous method of stowing the cargo at Costanza. Secondly, Captain Allen agreed that the surveyors who compiled Exhibit 12, referred to *supra*, should have been able to determine whether the cargo had been badly stowed at Costanza.[6] Lastly, on recross-examination the captain conceded that the difficulties he had said would be encountered in attempting to achieve a flat nonconical distribution of the ponderous, irregularly shaped ingots were not insurmountable ones. In fact, the captain acknowledged that he himself would have employed the special loading techniques set forth in Exhibit 12, procedures which the surveyor-authors of that report declared should have been, but were not, utilized at Costanza. Although on redirect Gemini's attorney then extracted from the witness an ac-

knowledgment that "[t]here are several [proper] ways" to stow a cargo, the testimony of this witness who had been retained solely for purposes of this litigation lends as much support to the defendants as it does to the plaintiff. Moreover, Captain Allen's testimony should be weighed in relation to the quantity and quality of evidence emanating from sources in a much more advantageous position than he to enlighten the trier of fact about the way the cargo was stowed at Costanza.

We now turn to the evidence to which it appears the district court did not assign any weight.

After the *Ionic* had arrived at Augusta, Gemini, in claiming against the time charterers of the vessel, itself recognized that there had been a "failure to stow the cargo properly at Costanza, as a result of which damage and faulty stowage the vessel must proceed from Augusta to another port [for] repairs and restowage of cargo." The district court's opinion does not even mention this candid admission on the part of Gemini.

In the general average agreement, prepared on behalf of Gemini and which Philipp was required to sign upon the ship's arrival at Charleston and before the cargo could be discharged,[7] the

---

6. The following colloquy took place on Allen's cross-examination:

Q Would you agree, sir, that two experienced marine engineers who were in daily attendance upon the vessel from September until December in connection with the discharge and re-stowing of cargo would be in an excellent position to give an opinion as to whether the cargo had shifted or had been very badly stowed at the outset?

A If they were in constant attendance I would rather imagine they should be able to issue a report.

7. Plaintiff cites and quotes Cia. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., *supra*, 274 F.2d at 898, for the proposition that

a general average statement is *prima facie* proof of (1) the losses, damages and expenses . . . . (2) the values attaching to such losses . . . ., and (3)

the computations proportioning these losses . . . between . . . ship and cargo.

That case involved a general average agreement identical to the one signed by Philipp here. *Cia. Atlantica* makes clear, however, that whatever evidentiary value may be assigned to the general average agreement once the cargo owner's underlying liability for *some* general average has been independently established, the signing of that general average agreement does not in any way preclude the cargo owner, as that owner does here, from denying *all* liability for general average on the grounds that the shipowner's fault produced the expense alleged to be subject to general average, and that, under COGSA, that fault would make the shipowner liable for any damage to the cargo. Furthermore, *Cia. Atlantica* appears consistent with Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc., 92 F.2d 41 (2

cargo was said to have "shifted *due to improper stowage*." (Emphasis inserted). Thus this Gemini-prepared agreement concludes what Gemini now denies, namely, that the improper stowage at Costanza caused the shifting, if any, of the cargo. The district court does not mention this piece of evidence.

Most importantly, the finding that the district court did make, that "[t]he testimony of the surveyors adverted to by the defendant[s] refers to the condition of stowage at the time the cargo was examined at Augusta or Naples, not at the time of departure from Costanza," is contrary to the conclusion of all the surveyors to whom the judge alludes. Their conclusion was that there had been improper stowage at Costanza.

Surveyor Santangelo examined the cargo at Augusta shortly after the *Ionic* arrived there. His determination was: "It was evident that there had been an irregular stowage distribution." The use of the past perfect tense "had been" demonstrates that he was referring to the distribution of the stowage at a time prior to his inspection of the cargo at Augusta. That time must have been while the ship was being loaded in Costanza. Indeed, this is exactly how Santangelo's conclusion was interpreted by Gemini itself, for, apparently on the basis of the information provided to it by Santangelo, Gemini advised the time charterers of the vessel, as we quoted *supra*, that there had been a "failure to stow the cargo properly at Costanza." Moreover, any doubt as to whether Santangelo was referring to the stowage at Costanza is dispelled by his 1971 admission by deposition that the stowage at Costanza had not been "very good."

The conclusions of the surveyors employed by Gemini who conducted the comprehensive investigation while the ship was in Naples are contained in Ex-

hibit 12. We cannot understand how the district court could have misconstrued the meaning and significance of this report. In short, the principal conclusion of the report was that "[t]he stowage conditions of the cargo *upon departure from Costanza* could have compromised the vessel's safety especially in trans-atlantic navigation." (Emphasis inserted). The report noted that the quantity of cargo which the surveyors at Naples found to have been stowed in a disorderly manner was the very same amount which had been loaded during the period at Costanza when the master was complaining to the stevedore about the lack of care taken by the stevedore's workers. Commenting on the difference in time taken to load this cargo at Naples from that taken to load the cargo at Costanza, the surveyors remarked: "The difference is enormous but so is the qualitative difference between the stowage realized at Naples and *that not taken care of at Costanza*." (Emphasis inserted). The surveyors even explored the reason "why at Costanza the last goods to be loaded were stowed in a disorderly manner and without any preoccupation for safety of the vessel":

"Be it clear that what follows are deductions convalidated by the difficulties encountered at Naples in putting the goods back aboard with sound stowage principles.

"Premised that the 'IONIC BAY', being a Liberty vessel, had a 'tween deck and as the breadth of the hatches was relatively narrow if compared to the breadth of the vessel, it is clear that the grab of a crane loaded with a big piece could easily be deviated up to the side when the said piece had to be put on the hold bottom but this manoeure became more difficult as the height of the goods arose until it became practically impossible when

Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937), where, despite the existence of a virtually identical general average agreement, this court conducted an independent examination of whether the vessel owner had been negligent and should

therefore be denied recovery for general average under the terms of the contract between the parties. The general average agreement here thus has no bearing on our resolution of the seminal issue of Gemini's fault.

the goods were 4 or 5 metres high from the bottom unless of course special measures were taken as they were at Naples (snatch block rings welded onto the ribs for pulling to the sides, by means of vessel's derricks, the pcs. on the crane). This was not done at Costanza and the pcs. had piled up at the hatch areas creating the situation which was noted at inspection of the 5th September.

"In brief the vessel had been loaded without thinking that it had to go to sea (the Atlantic) in a season when weather broke."

Beyond peradventure, this report establishes that the stowage at Costanza was improper, and we have a firm and definite conviction that a mistake was committed below in failing so to find.

Finally, the district court was further unable to perceive how the impending expiration of the International Load Line Certificate had any "bearing on the resolution of the issues presented by this claim." The bearing, we believe, is obvious. The *Ionic* was racing against the clock to clear Augusta by midnight of August 31, 1966. If she were successful in meeting this deadline, her Certificate would be automatically extended and would remain in force until she reached Charleston. Failure would mean that extensive, and expensive, repairs would have to be undertaken in order to obtain an extension. The impending expiration of the Certificate explains why the ingots were stowed so hurriedly and, as it turns out, so negligently, at Costanza. When the *Ionic* failed to meet the deadline it had set for itself, the vessel-owner then attempted to force Philipp to share in the costs of correcting the perilous condition of the stowage and also in the costs of "a series of verifications and works which

the vessel should have done before *loading* at Costanza but which were not done." Exhibit 12. (Emphasis inserted).

Reversed.[8]

---

8. In the court below appellant Philipp Brothers filed a counterclaim for $10,000 with interest which was represented to have been an advance by it toward the vessel repair and restowage costs incurred at Naples, but which had been made pursuant to an agreement with appellee that it was advanced "without prejudice." The court below awarded appellant Philipp Brothers the sum claimed, and this award was not appealed. Our judgment order reversing plaintiff-appellee's award does not affect the award on the counterclaim.